(161 App. Div. 745)

PEOPLE ex rel. CROWELL v. CONNOLLY, President of Borough of Queens.

(Supreme Court, Appellate Division, Second Department. April 17, 1914.)

1. MUNICIPAL CORPORATIONS (§ 218\*)—EMPLOYÉS—REMOVAL OR DISCHARGE—
REVIEW.

While the rule of res judicata may not preclude a reinvestigation of charges against a municipal employé after the dismissal thereof, the court, on certiorari to review the employé's dismissal, may treat such rejected charges as stale, a consideration which affects the weight and effect to be given them in determining whether there was sufficient ground for the employé's dismissal.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 589–598; Dec. Dig. § 218.\*]

2. MUNICIPAL CORPORATIONS (§ 213\*)—EMPLOYÉS—REMOVAL OR DISCHARGE—
GROUNDS.

A charge against an assistant engineer, in charge of a Borough Topographical Bureau, for approving a bill against the city for preparing certain benefit maps not in compliance with the original order, should not have been sustained where the original order was not produced, it appeared that the surveyor who made the maps was employed by the borough president, the engineer having no part in ordering them, that his assistant approved the bill only as to the dimensions of the property, and that the bill was eventually paid after opinions were obtained from three assistants to the corporation counsel as well as from examiners, a chief of division, and an engineer in the finance department, that the charge was proper.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 573, 574; Dec. Dig.·§ 213.\*]

3. MUNICIPAL CORPORATIONS (§ 213\*)—EMPLOYÉS—REMOVAL OR DISCHARGE—
GROUNDS.

It was not misconduct justifying the dismissal of the assistant engineer in charge of a Borough Topographical Bureau to discard a map of the unmapped parts of the borough which was not based on actual surveys, so that its elevations on which street improvements would depend were in places wrong by as much as 40 feet and its linear dimensions wrong in points by 1,000 feet.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 573, 574; Dec. Dig. § 213.\*]

4. MUNICIPAL CORPORATIONS (§ 213\*)—EMPLOYÉS—REMOVAL OR DISCHARGE—
GROUNDS.

Where an assistant engineer in charge of a Borough Topographical Bureau, in giving directions as to the loosening of stone in a street which was being repaved, directed that, in spots where the old pavement was worn down so as to leave only the stone of the bottom tier, this bottom stratum need not be dislodged, no incompetency, but at most an error of judgment, appeared, this being a matter of engineering experience as to which the practice varied according to local conditions; and hence his dismissal was improper, especially where the appropriation to. repair the street was inadequate.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 573, 574; Dec. Dig. § 213.\*]

\*For other cases see same topic·& § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Index∞

5. MUNICIPAL CORPORATIONS (§ 213*)—EMPLOYÉS—REMOVAL OR DISCHARGE—
GROUNDS.

Where the assistant engineer in charge of a Borough Topographical
Bureau purchased a pillar theodolite, expecting to make certain triangula-
tions which were later made by the United States Coast & Geodetic Sur-
vey, which theodolite proved efficient when used to connect the street sys-
tem with the wider triangulated points so made, it was not misconduct
justifying his dismissal for him to keep such instrument in his house for
several years to prevent its use in incautious experiments by junior sur-
veyors; it being available for use by the assistant engineers when re-
quired.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
573, 574; Dec. Dig. § 213.*]

6. MUNICIPAL CORPORATIONS (§ 213*)—EMPLOYÉS—REMOVAL OR DISCHARGE—
GROUNDS.

It was not misconduct justifying the removal of the assistant engineer
in charge of a Borough Topographical Bureau to charge the cost of dam-
age assessment maps to corporate stock funds instead of making up the
cost so as to charge it against the property owners, where this system
was not then in vogue, and neither the borough president nor any other
official had directed the keeping of a separate account of the time of the
draftsmen, who on the days they were engaged on such maps were also
doing general bureau work.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
573, 574; Dec. Dig. § 213.*]

7. MUNICIPAL CORPORATIONS (§ 217*)—EMPLOYÉS—APPOINTMENT—ELIGIBIL-
ITY.

The repeal of General Séwer Law (Laws 1889, c. 375) by the Village
Law (Laws 1897, c. 414, now Consol. Laws, c. 64) did not terminate the
employment of a sewer engineer by a village incorporated under a special
law, where its sewer system and his employment were by virtue of spe-
cial local acts recognizing its right to construct, operate, and maintain
sewers; and hence where his employment continued up to December 31,
1897, when such village became a part of Greater New York, his name was
properly placed by the Civil Service Commission on the eligible list un-
der Greater New York Charter (Laws 1901, c. 466) § 1536, providing that
the names of incumbents of positions abolished or made unnecessary by
consolidation should be placed on proper eligible lists.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
576, 577, 579, 580; Dec. Dig. § 217.*]

8. MUNICIPAL CORPORATIONS (§ 218*)—EMPLOYÉS—VALIDITY OF APPOINTMENT
—COLLATERAL ATTACK.

Where the head of a department made an appointment from names cer-
tified by the Civil Service Commission, and the employé's status there-
after remained for years under protection of the Civil Service Laws, his
position and tenure of office or the grading and rank given him on the
eligible list could not be collaterally attacked, especially in a proceeding
on charges of misconduct filed against him.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
589–598; Dec. Dig. § 218.*]

9. MUNICIPAL CORPORATIONS (§ 218*)—EMPLOYÉS—REMOVAL OR DISCHARGE—
RIGHT TO HEARING.

Though charges against a municipal employé emanate from another city
department or even from a bureau organized for investigation, they must
be established by the preponderance of testimony taken in his presence
and subject to an investigation conducted so as to protect his statutory
rights before he can be removed.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
589–598; Dec. Dig. § 218.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Certiorari by the People, on relation of Robert R. Crowell, against Maurice E. Connolly, president of the Borough of Queens, City of New York, commanding him to certify and return his proceedings in relation to the dismissal of relator from the office of assistant engineer of the Topographical Bureau of such borough. Determination of the borough president annulled, and relator ordered reinstated.

See, also, 160 App. Div. 903, 144 N. Y. Supp. 1138.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and PUTNAM, JJ.

Edward M. Grout, of New York City (Paul Grout and F. Sidney Williams, both of New York City, on the brief), for relator.

William E. C. Mayer, of New York City (Terence Farley and Elliot S. Benedict, both of New York City, on the brief), for respondent.

PUTNAM, J.  The relator, in January, 1900, was appointed assistant engineer in the Department of Bridges, and as such had charge of the triangulation for the Queensboro and Manhattan Bridges, also of other important surveys.  In 1903, he was promoted to the Topographical Bureau of Queens Borough, and so continued until the proceedings for his removal hereafter mentioned.  With the return to the writ appears a report by Mr. Fosdick, commissioner of accounts, to the mayor, dated August, 1910, in which were certain criticisms of the Topographical Bureau of Queens Borough.  This report was followed by charges presented against the relator by Borough President Gresser, before whom taking of testimony began August 12, 1910.  In the following November President Gresser dismissed all the charges except that numbered fifth, which accused Mr. Crowell of devoting most of his time to the Bureau of Highways—which apparently was deemed unimportant, as Mr. Gresser reinstated relator in his office.

In October, 1911, after respondent was in office, Mr. Hilty, chief examiner in the Commission of Accounts, informed the new borough president:

"That the commissioner of accounts thought that the charges against the said Robert H. Crowell tried before former Borough President Gresser had been sustained, and in spite of the dismissal of them by said borough president, that the said Robert R. Crowell ought not to be permitted to remain in charge of the Topographical Bureau of the Borough of Queens."

On March 5, 1912, Mr. Hilty presented a further report, adverse to the relator, in which he set forth charges of inefficiency, and questioned the relator's qualifications.

Respondent, in July, 1912, filed the charges now under review (16 in number), to most of which the relator urged in bar the prior dismissal by President Gresser, and maintained that those charges which had been thus adjudicated were not the subject of a second inquiry. This plea was overruled. Taking testimony and other proceedings ensued until, in July, 1913, a determination was made against relator. He was found guilty of charges numbered 10, 11, 12, and 15, and in part as to charges 1 and 7; and acquitted of charges numbered 2, 4, 8, 9, 13, 14, and 16.  Certain charges, numbered 3, 5, and 6, were ignored in the findings.  The relator was thereupon dismissed from office.

The charges not sustained need not now be considered except to note that they were among those which came from the Commission of Accounts.

[1] While it has not been directly held that the rule of res adjudicata precludes any reinvestigation of such charges (see Matter of Greenebaum v. Bingham, 201 N. Y. 343, 94 N. E. 853, and Matter of Hathaway v. Kline, 159 App. Div. 488, 144 N. Y. Supp. 538), the court can well treat such rejected charges and accusations as stale, a consideration which affects the weight and effect to be given them in determining if there was sufficient ground for the relator's dismissal (People ex rel. Dwyer v. Hogan, 101 App. Div. 216, 91 N. Y. Supp. 715).

We now take up the four charges found by defendant, which relate to acts of alleged misconduct.

[2] The seventh charge, so far as sustained, was for approving a bill against the city by the S. H. McLaughlin Company for preparing certain benefit maps of Harris avenue which "did not comply with the original order." These maps were for street openings. The issue was whether such a set of maps, supplied to the corporation counsel, should be in triplicate, or in sets of four. The original order for these maps was never produced. All efforts to obtain it failed. It then appeared that it was the borough president himself who employed the surveyor to make the necessary maps, so that relator had no part in ordering them; that his assistant, one Johnson, had approved this bill only as to dimensions of the property mapped; his approval in a qualified form was because the bill had been rendered for sets of four maps instead of three. When this bill came up for payment, separate opinions were obtained from three assistants to the corporation counsel, as well as from examiners, chief of division, and an engineer in the Finance Department. These opinions having held the charge proper, the bill was eventually paid. Mr. Clark, assistant corporation counsel, testified that when he passed on the bill it had not been approved by the relator. The charge as made for the maps actually furnished and used is supported by People ex rel. Crane v. Ahearn, 125 App. Div. 795, 110 N. Y. Supp. 306. This specification was therefore unfounded in all respects.

[3] The tenth specification was because Mr. Crowell discarded a so-called "study map" of the unmapped parts of the borough, without examining as to its use or adaptability. This was a large map, intended to embrace the entire borough, but not based throughout on actual surveys, so that its elevations (on which street improvements would depend) were in places wrong by as much as 40 feet, and its linear dimensions out in points by 1,000 feet. No use had ever been made of this cartographic vagary. To discard it would seem a plain duty in any bureau that sought accurate delineation of street lines or profiles.

[4] Specification No. 11 was in regard to resurfacing Hoffman Boulevard. Its original roadway, being subject to constant heavy traffic, proved unable to stand up and endure the great wear over that thoroughfare. In 1909, a repair contract had been made to put on the

old roadway a new 4-inch surface; the old stone work to be broken up or scarified before the new stone should be laid. There were, however, great inequalities where the old pavement had worn down in irregular holes, so as to leave only the stone of the bottom tier. The fault alleged against Mr. Crowell was that in such deeper spots he directed that the bottom stratum need not be dislodged, as it would have to be rolled back and replaced. The contract provided that the engineer should direct the loosening of the stone. Whether it was best to have this foundation stone broken up and then put back is a matter of engineering experience, where the practice varies according to local conditions. If the relator erred, it was an error of judgment, which did not necessarily show incompetency. But the expert testimony does not show that his course was a wrong one in the situations presented. Hoffman Boulevard was originally built on insufficient foundations. The appropriation to repair it was inadequate. The results should not be laid to relator's charge.

[5] The twelfth specification was for the purchase of a pillar theodolite, which was retained in relator's possession. This instrument could not be bought ready made. In 1907, when it was ordered, the Topographical Bureau naturally expected to make all the triangulations. Later, many of these determinations were conducted by the United States Coast & Geodetic Survey, from the government system of levels and bench marks. In 1911, when the bureau was called on to connect the street system with the wider triangulated points so determined, this theodolite proved efficient, and vindicated the foresight which had ordered it. As a precaution, this delicate instrument had been kept in relator's house for four years, as it was naturally feared that, being an attractive novelty to the junior surveyors, they might take it out and submit it to incautious experiments. The four assistant engineers, however, could always use it when required.

[6] The fifteenth specification was in charging the cost of certain damage assessment maps to corporate stock funds, instead of making up the cost from the time of the bureau employés, so as to charge these items upon the property owners. This system, obviously liable to great abuses, was not then in vogue. All of the borough employés concerned on these maps were also, on the same days, doing the required general bureau work, so that a charge for the time of making such maps, unless the hours of labor were scrupulously divided, might become an injustice to the property owners. Furthermore, the testimony was that neither the borough president nor any other official had directed the relator to keep separate account of the time of draftsmen while engaged on these maps, but, instead, that the order had been that this expense should come out of the regular funds.

This summary includes all findings of misconduct against Mr. Crowell. It shows how slight and ill founded such charges proved to be when subjected to the test of legal evidence.

The charge numbered first was as to the relator's qualifications. It was that Mr. Crowell had not properly qualified himself by civil service examination, or in technical education and training, to be assistant engineer in the Topographical Bureau. This was not new, as it restated the ninth Gresser charge, namely:

"That you are incompetent, in that you lack the proper technical education, training, and ability to successfully perform the duties as engineer in charge of the Topographical Bureau, Borough of Queens."

At the close of the evidence in support of the charges before this defendant, the corporation counsel conducting the prosecution announced that he did not propose to question "Mr. Crowell's fitness for the bureau, for the position which he held in respect to technical education and training." This withdrawal left only relator's status under the Civil Service Law, and his place on the eligible list.

So the contention for relator's removal came to this: Charges of misconduct may be made and tried, but, if not well founded, still the relator may be summarily removed, because not under that protection which the Civil Service Law gives to a veteran, although the record shows the removed official was originally duly certified as eligible for appointment by the secretary of the Civil Service Commission, and that this status continued on the certified payrolls for more than 12 years.

[7] The Greater New York Charter (Laws 1901, c. 466) § 1536, provided that, upon consolidation, employés in the different boroughs should be assigned, as nearly as may be, to perform the same service under the new city officers; incumbents of positions abolished or made unnecessary by consolidation were to be preferred for appointment, and their names placed on proper eligible lists, with a preference after veterans.

It is now contended that the relator's name was wrongly on this list, because his prior position in the service of the village of Jamaica had legally terminated six months before consolidation, namely, in July, 1897, when the new Village Law (Laws of 1897, c. 414 [Consolidated Laws of 1909, c. 64]) repealed the General Sewer Law (Laws of 1889, c. 375).

It would be a strange result that the enactment of the Village Law (which did not apply to any village like Jamaica, incorporated under a special law, sections 340, 341) had suddenly cut off the tenure of all sewer engineers, inspectors, and other employés engaged upon the sewer service of Jamaica. However, the Jamaica sewer system and the relator's employment had not been under the General Sewer Law, but were by virtue of the special local acts for Jamaica (Laws 1814, c. 68, as amended by Laws of 1855, c. 264; Laws of 1870, c. 266; Laws of 1890, c. 369; Laws of 1892, c. 344; Laws of 1894, c. 157), which recognized the right of Jamaica to construct, operate, and maintain sewers.

The record shows relator's appointment and designation as a sewer inspector in the village of Jamaica, in May, 1897. Before that (in 1893 and 1894), the relator had surveyed and mapped the local sewerage system, and had supervised its building, when he acted as assistant engineer, and was so designated in his salary checks. Although relator was not allowed to testify as to his direct relations with Jamaica in 1897, sufficient appeared to show a continuous employment by that village up to December 31, 1897. Therefore, within the terms of section 1536 of the Greater New York Charter, Mr. Crowell was clearly

an incumbent of a position, since these local sewer inspectors were unaffected by the repeal of the General Sewer Law. The Civil Service Commission, therefore, lawfully placed his name on the eligible list.

[8] In the present proceeding, the borough president could not attack the grading and rank given to the relator on such an eligible list. Matter of Simons v. McGuire, 204 N. Y. 253, 97 N. E. 526; People ex rel. Moriarty v. Creelman, 206 N. Y. 570, 100 'N. E. 446. And after his appointment in the Department of Bridges, the power of the Board of Estimate to fix the relator's salary may not be reviewed in this proceeding. Walters v. City of New York, 190 N. Y. 375, 83 N. E. 48.

[9] After a head of department has had names certified by the Civil Service Commission, and has made an appointment therefrom, and thereafter an employé's status has remained long under protection of the Civil Service Laws, his position and tenure of office is not open to collateral attack, especially in the course of a hearing upon charges for his removal. Matter of Seeley v. Stevens, 190 N. Y. 158, 82 N. E. 1095. His incompetency or other unfitness, if made out, may be a ground for dismissal; but, failing to support these specifications of incompetency, the borough president cannot summarily end his tenure by a dismissal, based upon alleged doubts as to how, at consolidation, he had been continued over and entered into the service of the greater city. Such an incumbent is entitled to stand on his appointment from the eligible list, and to the protection it conferred, until the invalidity of his appointment shall be made out. People ex rel. Dwyer v. Hogan, supra. This result does not reinstate an official lacking in efficiency, or in technical qualifications for his duties, for all these elements of fitness, though assailed in the charges, stood admitted on this record before the relator was called on for his defense. The protection of the relator's right to a position to which he was appointed is assured to him by the statutes of this state, unless he be found guilty after a hearing in a judicial proceeding. Although complaints and even formal charges may emanate from another city department, even a bureau organized for investigation, still accusations from such official sources must be established by testimony, taken in the presence of the relator, and subjected to an investigation conducted so as to protect his statutory rights. Where such charges are not sustained, leaving the finding against the accused official against the weight of evidence, the conditions essential to exercise the power of removal are wanting.

Hence respondent's determination dismissing relator should be annulled, upon the law and the facts, and the relator ordered reinstated in the position from which he was removed on July 15, 1913, with $50 costs and disbursements. All concur.